FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

NOV 4 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| TRINA RAY; SASHA WALKER, individually, and on behalf of all others similarly situated, | No.   20-56245 |
| | D.C. No. 2:17-cv-04239-PA-SK |
| Plaintiffs-Appellants, | |
| v. | OPINION |
| LOS ANGELES COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Defendant-Appellee, | |
| and | |
| CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, | |
| Defendant. | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted November 18, 2021
Pasadena, California

Before:  Marsha S. Berzon and Johnnie B. Rawlinson, Circuit Judges, and
Matthew F. Kennelly, [*] District Judge.

---

[*]   The Honorable Matthew F. Kennelly, United States District Judge for the
Northern District of Illinois, sitting by designation.

Per Curiam Opinion;
Partial Concurrence and Partial Dissent by Judge Berzon

## SUMMARY[**]

### Labor Law

The panel affirmed in part and reversed in part the district court's orders granting summary judgment in favor of Los Angeles County Department of Social Services and denying partial summary judgment to the plaintiffs in an action brought under the Fair Labor Standards Act by In-Home Supportive Services providers and other homecare workers.

Plaintiffs sought unpaid overtime wages for the period between January 1, 2015, and February 1, 2016, during which a Department of Labor rule entitling homecare workers to overtime pay under the FLSA was temporarily vacated. The district court conditionally certified a putative collective consisting of IHSS providers who worked overtime during this period.

Reversing in part and remanding, the panel held that the County was a joint employer, along with care recipients, of IHSS providers, and thus could be liable under the FLSA for failing to pay overtime compensation. The panel held that under *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), it must consider the "economic reality" and apply four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." The court in *Bonnette* held that the State of California and three counties were joint employers of IHSS providers. The panel held that, notwithstanding differences between the IHSS program operating in Los Angeles County today and the programs analyzed in *Bonnette*, the County was a joint employer of plaintiffs, in light of the economic and structural control it exercised over the employment relationship. The panel directed the district court, on remand, to grant partial summary judgment to plaintiffs on the issue of whether the County was a joint employer of IHSS providers.

Affirming in part, the panel held that the district court did not err in granting

---

[**]  This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

2

partial summary judgment to the County on the issue of willfulness and denying partial summary judgment to plaintiffs on the issue of liquidated damages. The panel held that a determination of willfulness and the assessment of liquidated damages are reserved for the most recalcitrant violators. Here, it was undisputed that the County had no ability to pay overtime wages in the absence of the State making funds available to satisfy the overtime obligations. It was also undisputed that resolution of the overtime wages for IHSS providers in California played out in public, including numerous training sessions on implementing the new FLSA requirements. The panel held that, under this circumstance, it agreed with the district court that the County acted in good faith.

Concurring in part and dissenting in part, Judge Berzon joined the majority's holding that the County was a joint employer. She disagreed with the majority's holding that because, as a practical matter, the State controlled the payroll system (1) the County acted in good faith for purposes of determining whether it had established a defense to liquidated damages; and (2) the County's failure to pay overtime wages could not have been willful for purposes of determining the applicable statute of limitations. Judge Berzon wrote that, although the result the majority reached on liquidated damages and willfulness may seem equitable, it was not consistent with the standards the panel was obligated to apply under the FLSA. She would hold that the County was, on the record here, liable for liquidated damages. For purposes of determining whether the County's conduct was willful, she would hold that plaintiffs raised a triable issue of fact as to whether the County knew or showed reckless disregard that its conduct violated the FLSA.

## COUNSEL

Matthew C. Helland (argued) and Daniel S. Brome, Nichols Kaster LLP, San Francisco, California; Philip Bohrer, Bohrer Brady LLC, Baton Rouge, Louisiana; for Plaintiffs-Appellants.

Jennifer M. Hashmall (argued), Jason H. Tokoro, Jeffery B. White, and Emily A. Rodriguez-Sanchirico, Miller Barondess LLP, Los Angeles, California; Lester J. Tolnai, Office of the County Counsel, Los Angeles, California; for Defendant-Appellee.

Jennifer Bacon Henning, California State Association of Counties, Sacramento, California, for Amicus Curiae California State Association of Counties.

3

Per Curiam

The State of California and the County of Los Angeles administer an In-Home Supportive Services program ("IHSS program"), which allows low-income elderly, blind, or disabled residents of the County to hire a provider to help them with daily living activities. In 2013, the U.S. Department of Labor ("DOL") issued a new rule entitling IHSS providers and other homecare workers to overtime pay under the Fair Labor Standards Act ("FLSA"). 78 Fed. Reg. 60,454 (Oct. 1, 2013) (codified at 29 C.F.R. pt. 552). A district court vacated the rule before January 1, 2015, the rule's scheduled effective date. *Home Care Ass'n of Am. v. Weil* ("*Weil*"), 76 F. Supp. 3d 138, 148 (D.D.C. 2014). The D.C. Circuit reversed, upholding the rule in a decision that mandated on October 13, 2015. *Home Care Ass'n of Am. v. Weil* ("*Weil II*"), 799 F.3d 1084, 1087 (D.C. Cir. 2015). The State began paying overtime wages to IHSS providers on February 1, 2016.

In June 2017, Trina Ray, an IHSS provider in Los Angeles County, filed a putative collective action against the County seeking relief for unpaid overtime wages for the period between January 1, 2015, and February 1, 2016.[1] This is our second published opinion in this case. Our previous opinion, *Ray v. County of Los Angeles* ("*Ray I*"), 935 F.3d 703 (9th Cir. 2019), held, first, that the County was

---

[1] Ray initially named California as a defendant but later voluntarily dismissed the State. Ray filed an amended complaint adding a second named plaintiff, Sasha Walker. We refer to the plaintiffs collectively as "Ray."

not an "arm of the state" with respect to the implementation of the IHSS program and therefore was not entitled to Eleventh Amendment immunity from suit, and, second, that the effect of *Weil II* was to reinstate the overtime rule's original effective date of January 1, 2015. *Id.* at 705, 713–14.

Three summary judgment rulings by the district court are at issue in this appeal: The court granted summary judgment to the County on the ground that the County does not employ IHSS providers for purposes of the FLSA, granted partial summary judgment to the County on the issue of willfulness, and denied partial summary judgment to Ray on the issue of liquidated damages. We unanimously hold that the County is a joint employer of IHSS providers under the FLSA, and we reverse the district court's ruling to the contrary. In this per curiam opinion, Judges Rawlinson and Kennelly also affirm the district court's rulings on willfullness and liquidated damages. Judge Berzon dissents with regard to those rulings.

## I.

## A.

California's IHSS program "serves hundreds of thousands of recipients." *Ray I*, 935 F.3d at 705. Providers help qualified individuals in their homes with "daily activities like housework, meal preparation, and personal care." *Id.* "California implements the program through regulations promulgated by the

California Department of Social Services (CDSS), and the program is administered in part by California counties." *Id.* The federal government, the State, and the counties all contribute funding to the program.

"In the County of Los Angeles alone there are about 170,000 homecare providers and more than 200,000 recipients." *Id.* County residents seeking IHSS services apply through the County. County social workers review applications and conduct in-home visits to assess recipients' needs. Social workers determine the services recipients are entitled to receive, the time allotted for each service, and the total number of hours a provider may work for the recipient each month.

"Recipients . . . retain the right to hire, fire, and supervise the work of any in-home supportive services personnel providing services for them." Cal. Welf. & Inst. Code § 12301.6(c)(2)(B). Prospective providers must attend an in-person orientation in a County field office, where they view state-provided training materials and sign state-issued forms. Cal. Welf. & Inst. Code § 12301.24.

The County has established a public authority, the Personal Assistance Services Council, that serves as providers' employer of record for collective bargaining purposes. The Personal Assistance Services Council maintains a registry of providers, coordinates provider background checks, and provides training for providers and recipients.

Recipients are responsible for setting their provider's work schedule. *See id.*

6

§ 12300.4(d)(1)(A). Recipients also review and approve their provider's timesheets. Providers submit their timesheets directly to the State, which issues their paychecks.[2]

**B.**

As mentioned, DOL issued a new rule in 2013 entitling IHSS providers to overtime pay under the FLSA. 78 Fed. Reg. 60,454. "Before the *Weil I* decision, California (through the CDSS) began taking steps to meet the January 1, 2015, implementation date, including modifying its systems to process and calculate overtime compensation." *Ray I*, 935 F.3d at 707 (internal quotation marks omitted). The County participated in state-organized meetings and trainings on the new overtime rule beginning in 2014.

After *Weil I* vacated the new rule, "the CDSS decided that it would not implement overtime payments 'until further notice.'" *Id.* Once *Weil II* upheld the rule, DOL announced that it would "not bring enforcement actions against any employer for violations of FLSA obligations resulting from the amended domestic service regulations for 30 days after the date the mandate [in *Weil II*] issues," 80 Fed. Reg. 55,029, 55,029 (Sept. 14, 2015), which occurred on October 13, 2015. DOL later confirmed that it would not begin enforcing the rule until November 12,

---

[2] We provide more specifics about the roles of the County and State as pertinent to our substantive analysis, below.

2015, and also stated that through December 31, 2015, it would "exercise prosecutorial discretion in determining whether to bring enforcement actions, with particular consideration given to the extent to which States and other entities have made good faith efforts to bring their home care programs into compliance with the FLSA." 80 Fed. Reg. 65,646, 65,646 (Oct. 27, 2015).

On December 1, 2015, the State notified all counties that it would begin implementing the rule on February 1, 2016. The County supported the State's implementation plan by training County staff on the new overtime requirements, conducting information sessions for providers and recipients, and developing informational materials. California began paying overtime wages to providers on February 1, 2016.

Ray filed suit in June 2017, seeking relief for unpaid overtime wages between January 1, 2015, and February 1, 2016. After we decided *Ray I*, the district court conditionally certified a putative collective consisting of IHSS providers in Los Angeles County who worked overtime between January 1, 2015, and January 31, 2016. More than 10,000 providers opted in as plaintiffs.

The parties filed several motions for partial summary judgment. First, Ray sought partial summary judgment on the issue of whether the County was liable for liquidated damages for the time period after October 13, 2015—the date that *Weil II* mandated. The district court denied the motion, ruling that there was a "factual

8

dispute as to whether the County [was] Plaintiffs' employer," and that the County had "presented evidence of its efforts to comply with the FLSA, sufficient to avoid summary judgment as to its good faith defense to liquidated damages at this stage."

Second, the County asked the district court to find that the statute of limitations for Ray's FLSA claims was two years, rather than three years for "willful" violations. The district court granted partial summary judgment to the County on this issue, ruling that "the County's inability to implement overtime payment to IHSS providers demonstrates as a matter of law that the County's alleged violation of the FLSA was not 'willful,'" and that "the undisputed facts in the record show that the County did not act with knowing or reckless disregard of whether its conduct was prohibited by the FLSA."

Finally, both sides moved for partial summary judgment on the issue of whether the County was an employer of IHSS providers. Only an employer covered by the statute can be liable under the FLSA for failing to pay overtime compensation. After weighing several factors, the district court held that "as a matter of law . . . the 'economic reality' is that the County is not an employer of IHSS providers." The court therefore granted summary judgment in favor of the County.

Ray timely appealed all three orders. Because the district court's determination that the County does not employ IHSS providers could be

dispositive of the entire action, we address the last order first.

## II.

The district court erred in granting summary judgment to the County on the ground that the County does not employ IHSS providers.

"The FLSA broadly defines the 'employer-employee relationship[s]' subject to its reach." *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) (alteration in original) (citation omitted). "'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). "'Employer' includes any person acting directly or indirectly in the interest of an employer . . . ." *Id.* § 203(d).

"[A]n employee may have more than one employer under the FLSA." *Torres-Lopez*, 111 F.3d at 638. DOL so recognized in a regulation providing guidance on joint employment. 29 C.F.R. § 791.2 (2019).[3] "All joint employers are individually responsible for compliance with the FLSA." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983) (citing 29 C.F.R. § 791.2(a)), *disapproved of on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). Like the employer-employee relationship itself, "the concept of joint employment should be defined expansively under the FLSA." *Torres-Lopez*, 111 F.3d at 639. The parties agree that, to decide whether

---

[3] Section 791.2 is not currently in effect but was in effect during the time period at issue in this case. *See* 86 Fed. Reg. 40,939 (July 30, 2021).

the County is a joint employer of IHSS providers, we must consider the "economic reality," applying the four factors enumerated in *Bonnette*: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." 704 F.2d at 1469–70.

Ray maintains that *Bonnette* directly controls this case. *Bonnette* held that the State and three counties (not including Los Angeles County) were joint employers of IHSS providers, then called "chore workers," "under the FLSA's liberal definition of 'employer.'" 704 F.2d at 1470. The County disagrees that *Bonnette* is dispositive, and points to differences between the IHSS program operating in Los Angeles County today and the programs analyzed in *Bonnette*. We conclude that *Bonnette*'s analysis and result do apply here, notwithstanding the differences identified by the County.

*Bonnette* addressed whether recipients of services were the sole employers of IHSS providers for FLSA purposes or whether the State and counties were joint employers as well. We reasoned that the State and counties had "complete economic control" over the employment relationship, because they paid the providers' wages and "controlled the rate and method of payment." *Id.* The State and counties also "maintained employment records." *Id.* Additionally, the State

11

and counties "exercised considerable control over the nature and structure of the employment relationship." *Id.* They made the "final determination, after consultation with the recipient, of the number of hours each chore worker would work and exactly what tasks would be performed." *Id.* Although *Bonnette* did not take a position on whether the State and counties should be "viewed as having had the power to hire and fire" providers, we observed that "their power over the employment relationship by virtue of their control over the purse strings was substantial." *Id.* In light of the economic and structural control the State and counties exercised, *Bonnette* concluded that the State and the counties were joint employers of IHSS providers. *Id.*

The most significant change between the IHSS program when *Bonnette* was decided and now concerns the payment of providers. At the time of *Bonnette*, the counties were responsible for making payments either to recipients of services, who then paid their providers, or directly to providers. *Bonnette*, 704 F.2d at 1468. The counties did not fund those payments, however. The federal government provided 75% of the funding for the program and the State, 25%. *Id.* at 1467; *Bonnette v. Cal. Health & Welfare Agency*, 525 F. Supp. 128, 130 (N.D. Cal. 1981). The "counties were relieved of any financial responsibility." 525 F. Supp. at 130.[4]

---

[4] The County maintains that it has "always contributed funds that make up a small

Today, payroll is consolidated statewide, and the State issues paychecks to IHSS providers. We are not persuaded that the State's assumption of payroll responsibility changes *Bonnette*'s analysis. The County continues to exercise considerable economic and structural control over the employment relationship in a variety of ways.

As to economic control, the record shows that the County contributes a substantial amount of funding to the IHSS program. As the result of a 1991 "realignment" of State and county responsibilities for social services, counties are now responsible for 35% of the nonfederal costs of the program.[5] *See* Cal. Welf. & Inst. Code § 12306(c) (1992). The County maintains that its 35% share of program costs is only nominal, because the State offsets the increase by directing revenue from sales taxes and vehicle license fees to the counties. *See* Cal. Welf. & Inst. Code §§ 17602, 17604. The record indicates, however, that counties have some flexibility in deciding how to spend the realignment funds they receive from the State. For one thing, the funds are deposited in a social services account, which the County uses to fund a variety of social services programs, not just the IHSS

fraction of the total IHSS program costs," citing a document from the Legislative Analyst's Office showing that before 1991, counties were responsible for 3% of program costs.

[5] In 2012, the State passed "Maintenance of Effort" legislation, which capped the counties' ongoing contributions to the IHSS program to no more than a 3.5 percent annual increase. Cal. Welf. & Inst. Code § 12306.15(c)(1), *repealed* (2017).

program. *See* Cal. Welf. & Inst. Code § 17602(a). Counties are authorized to transfer a certain percentage of funds among their social services, health, and mental health accounts.

Moreover, during the time period under consideration in this case, the County contributed significant additional funding to the IHSS program, apart from the realignment revenue it received from the State. A representative of the County testified that in fiscal year 2014–2015, the County paid its share of IHSS program costs using $118 million from its general fund and $237 million in realignment revenue. The representative also testified that the County's share of program costs goes toward provider wages.

Given that the County makes a significant financial contribution to provider wages, *Bonnette*'s finding that providers "were paid by the [counties and State]" remains accurate, even though the State is now responsible for cutting the checks.[6] 704 F.2d at 1470. If anything, the County's share of funding for provider wages is greater than it was at the time of *Bonnette*.

---

[6] The California Court of Appeal reached the same conclusion in rejecting a demurrer by Sonoma County to an IHSS provider's suit for unpaid wages and overtime under the FLSA. *See Guerrero v. Superior Court*, 213 Cal. App. 4th 912, 933 (2013), *as modified on denial of rehearing* (Mar. 11, 2013). The court held that, "[a]s was the case in *Bonnette*, . . . the chore workers' wages were determined and paid by the state and its agents, [Sonoma] County and [the county's] Public Authority," although the "providers were paid directly by the state." *Id.* (emphasis omitted).

14

Additionally, the County now has the authority, either by itself or through a separate entity, to negotiate for wages covering the providers. Cal. Welf. & Inst. Code § 12302.25. So the County sets or could set wages. As mentioned, the County has established a public authority for collective bargaining purposes, the Personal Assistance Services Council. The County can negotiate to pay providers a rate above the state minimum wage, although the State must review and approve all changes. Cal. Welf. & Inst. Code § 12306.1(a). California pays "65 percent and the County 35 percent of the nonfederal share of wage and benefit increases negotiated by the Public Authority, with the state contribution capped at a maximum amount set by statute." *Guerrero*, 213 Cal. App. 4th at 933 (citing Cal. Welf. & Inst. Code § 12306.1(c), (d)). Between 2012 and 2016, the County requested pay increases for providers and the State approved those increases. The County therefore "exercised some power in determining the pay rates" for providers. *Torres-Lopez*, 111 F.3d at 643. Such authority is a significant indication of joint employer status even though the employer "was not involved in preparing [employees'] payroll or directly paying their wages." *Id.*[7]

The County also chooses the method of payment, as it did at the time of *Bonnette*. At that time, as today, California state law "specified three methods by

_____

[7] *Torres-Lopez* held a grower a joint employer of farmworkers although a labor contractor prepared the payroll and directly paid the wages.

15

which the counties could deliver chore worker services: the counties could hire chore workers directly, contract with agencies or individuals for such services, or make direct payment to the recipients for the 'purchase' of chore worker services." 704 F.2d at 1467 (citing Cal. Welf. & Inst. Code § 12302). In *Bonnette*, all three counties had chosen "the third method of delivery."[8] *Id.* Here, too, the County chose to use the third option, the "direct payment" method.[9] The County therefore exercises at least some control over the method of payment, as in *Bonnette*.

Besides exercising substantial economic control, the County also continues to "exercise considerable control over the nature and structure of the employment relationship," as in *Bonnette*. 704 F.2d at 1470. In *Bonnette*, a county social worker would "consult[] with the recipient and others, using a standard county form," and

---

[8] The district court in this case misconstrued the facts in *Bonnette* with respect to the counties' choice of service delivery. The court stated incorrectly that "[a]ll three counties at issue in *Bonnette* chose the first option for assisting the state with the IHSS program. In other words, the counties opted to hire providers directly with money provided by the counties." The court erroneously distinguished *Bonnette* on that basis.

[9] The statutory language describing the "direct payment" option refers to payments to recipients, but in *Bonnette*, payments were sometimes conveyed directly to providers: "At different times the counties used various methods of payment, including two-party checks payable to the recipient and chore worker, checks payable directly to the recipient with the understanding that the recipient would pay the chore worker, and checks payable directly to the chore worker." 704 F.2d at 1468. Likewise, today, although payments are conveyed directly to providers, the parties agree that the County uses the third, direct payment option, presumably because it is evident that the County is not hiring the providers or contracting with agencies or individuals for such services.

16

"would determine the tasks to be performed for the recipient by the chore worker and the hours per week required to perform the tasks." 704 F.2d at 1468. Similarly, today a County social worker performs an initial in-home assessment of the recipient's needs and applies state guidelines to determine how many service hours the recipient is eligible to receive. The social worker reviews a list of twenty-five types of services that IHSS providers can give and assigns a "functional rate index" number of 1 to 5 for each of the services for which the recipient qualifies. The social worker then authorizes the number of hours allocated to each task, based on state guidelines prescribing a range of hours for each task at each functional ranking. The social worker may deviate from the prescribed range if the worker justifies the deviation.

Once the County has authorized the tasks and service hours the recipient is entitled to receive, it is up to the recipient to set the IHSS provider's schedule, Cal. Welf. & Inst. Code § 12300.4(d)(1)(A), just as in *Bonnette* the "recipient was responsible for the day-to-day supervision of the chore worker," 704 F.2d at 1468. "These aspects of the relationship between recipient and provider are no different than when *Bonnette* was decided." *Guerrero*, 213 Cal. App. 4th at 936–37.

Today, however, if a recipient needs a provider to work overtime hours beyond the authorized amount, the recipient must request County approval, except in narrow circumstances. And today, County social workers inspect the home to

17

make sure recipients are receiving the care they need.

Finally, the County is the public face of the employer as far as the providers are concerned. Prospective providers attend an orientation session conducted by County employees at a County field office, where they view state-provided training materials and sign state-issued forms. Cal. Welf. & Inst. Code § 12301.24. The County also assigned dozens of employees to answer providers' questions regarding the overtime requirements at issue here. And the County maintains some employment records, including the forms a provider signs when applying for employment, a copy of the provider's ID, and a copy of the provider's Social Security card.

In light of the economic and structural control the County exercises over the employment relationship, we conclude that *Bonnette*'s holding that counties are joint employers of IHSS providers applies to the County. We reverse the district court's grant of summary judgment to the county and direct the court to grant partial summary judgment to Ray on this issue.

**III.**

The district court did not err in granting partial summary judgment to the County on the issue of willfulness and denying partial summary judgment to Ray on the issue of liquidated damages. A review of the cases addressing willfulness and the assessment of liquidated damages under the FLSA reflect that a

18

determination of willfulness and the assessment of liquidated damages are reserved for the most recalcitrant violators. *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003) ("[W]e will not presume that conduct was willful in the absence of evidence.") (citation omitted); ("[C]ourts need not award liquidated damages in every instance . . .");  *see also Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1072 (9th Cir. 1990) (noting that the case was not one "like many of those cited by the Employees, where the employer is using 'ticky-tack' reasons to attempt to evade the wage and hour laws") (alterations omitted). The County does not belong in that group of recalcitrant employers.

It is undisputed that the County had no ability to pay overtime wages in the absence of the State making funds available to satisfy the overtime obligations. *See Ray v. Cnty. of Los Angeles*, 935 F.3d 703, 711 (9th Cir. 2019) (*Ray I*) ("[T]he County contends — and Plaintiffs do not dispute — that it has no discretion over the action (or inaction that subjected it to potential liability here: payment of overtime wages under the FLSA.")

In *Ray I*, we noted that "[t]he County had no choice in the matter of the overtime wages, as the State mandated the payment start date." *Id.* That conclusion has not changed. Specifically relying on our opinion in *Ray I*, the district court found that "the facts of this case demonstrate as a matter of law that the County had no authority or ability to implement overtime pay for [In-Home Supportive

19

Services] (IHSS) providers." *District Court Order*, p. 6.

We agree with the district court's reliance on our reasoning in *Ray I*, and its application of that binding precedent to the facts of this case. Notably, as the district court determined, the payroll systems for IHSS providers "are all centralized on a state-wide database controlled by [the California Department of Social Services]," rather than by the County. *Id.*[10]

The facts of this case are more akin to those declining to impose a willfulness penalty on the employer in the absence of an affirmative refusal to comply with the requirements of the FLSA. For example, in *Bratt*, we reasoned that there was no evidence in the record "that the County attempted to evade its responsibilities under the Act." 912 F.2d at 1072. We explained that "a decision made above board and justified in public," as was done by the County in this case, "is more likely" made in good faith. *Id.* (alteration omitted).

We added that liquidated damages "are designed in part to compensate for concealed violations, which may [otherwise] escape scrutiny." *Id.*

It is undisputed that resolution of the overtime wages for IHSS providers in California played out in public, including numerous training sessions on implementing the new FLSA requirements. Under this circumstance, we agree

---

[10] Our colleague in dissent characterizes the State's fiscal control as "a practical matter." This description is not consistent with the holding in *Ray I*.

with the district court and with our precedent in *Bratt* that the County acted in good faith. *See id.*

The facts in this case are in stark contrast to those in *Alvarez*, in which we upheld the district court's determination of "willful conduct." 339 F.3d at 909. The employer in *Alvarez* "took no affirmative action to assure compliance with [the FLSA requirements]." *Id.* Rather, the employer "attempt[ed] to evade compliance, or to minimize the actions necessary to achieve compliance." *Id.* (footnote reference omitted). We emphasized that the employer "could easily have inquired into . . . the type of steps necessary to comply" with the provisions of the FLSA, but failed to do so. *Id.* (citation and internal quotation marks omitted).

There is absolutely no evidence in the record that the County "attempt[ed] to evade compliance, or to minimize the actions necessary to achieve compliance" with the overtime provisions of the FLSA. *Id.* Instead, the record reflects that the only reason that the County failed to pay the required overtime wages sooner is because the State controlled the purse strings.

**IV.**

We REVERSE the district court's grant of summary judgment to the County on the ground that the County does not employ IHSS providers. On remand, the district court is directed to grant partial summary judgment to Ray on the issue of whether the County is a joint employer of IHSS providers. The majority AFFIRMS

the district court's decisions granting partial summary judgment to the County on the issue of willfulness and denying partial summary judgment to Ray on the issue of liquidated damages; Judge Berzon dissents from those holdings for the reasons stated in her dissent.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

*Ray v. Los Angeles County Department of Public Social Services*, No. 20-56245

BERZON, Circuit Judge, concurring in part and dissenting in part:

I fully concur in the per curiam opinion to the extent it holds that the district court erred in granting summary judgment to the County of Los Angeles on the ground that the County does not employ In-Home Supportive Services ("IHSS") providers. Per Curiam Op. 10. The opinion rightly holds that based on the County's economic and structural control over the employment relationship, the County is a joint employer of IHSS providers. Per Curiam Op. 18. Notwithstanding that conclusion, the majority holds that because, as a practical matter, the State controlled the payroll system (1) the County acted in good faith for purposes of determining whether it has established a defense to liquidated damages; and (2) the County's failure to pay overtime wages could not have been willful for purposes of determining the applicable statute of limitations. Per Curiam Op. 18–21. I disagree as to each of these holdings. Although the result the majority reaches on liquidated damages and willfulness may seem equitable, it is not consistent with the standards we are obligated to apply under the Federal Labor Standards Act ("FLSA"). I would therefore reverse the district court's denial of partial summary judgment to the plaintiffs ("Ray") as to liquidated damages, as well as the district court's grant of partial summary judgment to the County on the question of willfulness.

1

# I.

"In addition to overtime compensation, successful FLSA plaintiffs are entitled to liquidated damages in the amount of the unpaid overtime compensation (i.e. double damages)." *Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014) (citing 29 U.S.C. § 216(b)). "Liquidated damages are 'mandatory' unless the employer can overcome the 'difficult' burden of proving both subjective 'good faith' and objectively 'reasonable grounds' for believing that it was not violating the FLSA." *Id.* (quoting *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909–10 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005)); *see* 29 U.S.C. § 260. Thus, Ray is entitled to partial summary judgment on this issue if the County is unable to meet its burden of establishing either of these two prongs. Because the County falls short on both, I would hold that the district court erred in denying the motion for partial summary judgment.

The majority's analysis of this issue begins with the premise that "the assessment of liquidated damages [is] reserved for the most recalcitrant of violators." Per Curiam Op. 19. That starting premise is just wrong. Under the FLSA, "liquidated damages represent compensation, and not a penalty." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003) (quoting *Local 246 Util. Workers Union v. S. Cal. Edison Co.*, 83 F.3d 292, 297 (9th Cir. 1996)). "Double damages are the norm; single damages are the exception." *Id.*

2

Here, Ray moved for partial summary judgment as to the County's liability for liquidated damages for the time period after October 13, 2015, the date *Home Care Ass'n of Am. v. Weil* ("*Weil II*"), 799 F.3d 1084 (D.C. Cir. 2015), mandated. The district court denied Ray's motion on two grounds, ruling first that there was a "factual dispute as to whether the County [was] Plaintiffs' employer," and, second, that the County had "presented evidence of its efforts to comply with the FLSA, sufficient to avoid summary judgment as to its good faith defense to liquidated damages at this stage." The per curiam opinion's holding that the County employs IHSS providers eliminates the first ground. And I disagree with the district court's holding that the County's evidence creates a triable issue as to whether the County's effort *eventually* to comply with the FLSA's overtime requirements is a viable affirmative defense to the usual liquidated damages for the period between October 13, 2015, and February 1, 2016, for which overtime wages have never been paid.

"To satisfy the subjective 'good faith' component, the County [is] obligated to prove that it had 'an honest intention to ascertain what the FLSA requires and to act in accordance with it." *Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1072 (9th Cir. 1990) (alterations omitted). For the objective component, the County must prove it had "objectively 'reasonable grounds' for believing that it [did] not

3

violat[e] the FLSA" for the period between October 13, 2015, and February 1, 2016. *See Haro*, 745 F.3d at 1259.

The County cites a single case, *Bratt*, in which we concluded that an employer (also Los Angeles County in that case) had successfully made out a good faith defense to liquidated damages under the FLSA. In *Bratt*, there was no evidence "that the County had anything other than an honest intention to comply with the Act," satisfying the subjective component of the test. 912 F.2d at 1072. And the County's conclusion that certain employees were exempt from FLSA coverage, based on its interpretation of FLSA regulations, was "incorrect" but "not unreasonable," satisfying the objective component. *Id.*

Here, the County has asserted on the merits that it does not employ IHSS providers. But Ray introduced evidence that the County knew that courts could well decide it was an employer of IHSS providers for FLSA purposes: the County knew that DOL and state agencies had taken the position that it was a joint employer of IHSS providers; there was pending litigation on the issue; and other counties had been held liable for both back wages as well as liquidated damages. And the existing judicial precedents, as well as decisions of the California Labor Commissioner, pointed toward holding the County liable as a joint employer. *See Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983); *Guerrero v. Superior Court*, 213 Cal. App. 4th 912, 930–37 (2013).

4

Moreover, unlike in *Bratt*, the County does *not* argue, for purposes of meeting the narrow defense to the liquidated damages obligation, that it believed IHSS providers were not entitled to overtime pay during the relevant period. Ray pointed to evidence that the County knew the overtime rule would take effect on October 13, 2015, when *Home Care Ass'n of Am. v. Weil* ("*Weil II*"), 799 F.3d 1084 (D.C. Cir. 2015) mandated. *See infra* pp. 8–9, 12.

Instead, the County maintains that it showed subjective good faith because paying overtime wages required California to make "sweeping" and "complex" changes to the IHSS program, and the County participated in the State's efforts. In other words, complying with the FLSA was difficult and took time, and the State and County implemented overtime pay as quickly as they could.

The problem with this argument is that, even if the County could show that it was not practical to pay overtime wages before February 1, 2016—more than three months after *Weil II* mandated—that showing alone would not satisfy the subjective component of the good faith test. To this day, IHSS providers have never been paid overtime wages for the period between October 13, 2015, and February 1, 2016. And although the County contends it "took substantial steps to help the State comply with the FLSA in 2015 and 2016," nowhere does the County argue that it raised the matter of paying overtime wages for the period from October 13, 2015, and February 1, 2016 with the State, or that it took other steps to

5

promote compliance with their joint obligation to pay overtime for that period, even retroactively. Given the complete failure to pay the IHSS providers overtime wages for that period either when they were owed or retroactively *and* the absence of any contention by the County that it believed payment was not required,[1] the County has not demonstrated "an honest intention to ascertain what the FLSA requires and to act in accordance with it." *Bratt*, 912 F.2d at 1072.

Nor has the County raised a triable issue on the second required showing, whether it had "objectively 'reasonable grounds' for believing that it was not violating the FLSA" after October 13, 2015. *See Haro*, 745 F.3d at 1259. Notably, the majority's liquidated damages discussion does not address this essential prong at all.

The County's argument on objective reasonableness is threefold: (1) the U.S. Department of Labor ("DOL") guidance on the final rule "highlighted the State"; (2) the February 1, 2016, implementation date was objectively reasonable, in light of the "shifting legal landscape" and DOL's time-limited nonenforcement policy; and (3) the State controls payroll for IHSS providers, and the County had no authority to pay overtime wages sooner.

---

[1] That the County was aware of the overtime obligation for the contested period is reinforced by County documents in the record, which discuss the possibility that IHSS providers would be owed retroactive pay for overtime after October 13, 2015.

In support of its first argument, the County cites an announcement from DOL indicating that the federal agency, in exercising its enforcement discretion, would give "particular consideration . . . to the extent to which States and other entities have made good faith efforts to bring their home care programs into compliance with the FLSA since promulgation of the Final Rule." 79 Fed. Reg. at 60,974. The County does not explain the significance of this quotation—which on its face refers to "States *and other entities*," not just "States." 79 Fed. Reg. at 60,974 (emphasis added). The sentence certainly is not sufficient to override the rule that "joint employers are individually responsible for compliance with the FLSA." *Bonnette*, 704 F.2d at 1469. Nor does it establish that DOL does not consider any counties to be employers of IHSS providers. Elsewhere, DOL has said just the opposite. In 2014, DOL issued an opinion letter entitled "Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act," which explained that "a state itself, a statewide agency that oversees Medicaid programs, or a county department of aging could all be potential joint employers of home care workers providing services through a consumer-directed program." Dep't of Labor, Administrator's Interpretation No. 2014-2, 2014 WL 2816951, at *4 (June 19, 2014).

As for the County's second contention, DOL's time-limited non-enforcement policy does not excuse the State and County's failure to pay overtime wages before February 1, 2016. After *Weil II* upheld the overtime rule, DOL said it would not begin enforcing the rule until November 12, 2015, and that through December 31, 2015, it would "exercise prosecutorial discretion in determining whether to bring enforcement actions." 80 Fed. Reg. 65,646, 65,646 (Oct. 27, 2015). But as recognized in *Ray v. County of Los Angeles* ("*Ray I*"), 935 F.3d 703 (9th Cir. 2019), "[a]n agency's discretionary decision to hold off enforcement does not and cannot strip private parties of their rights to do so." *Id*. at 715; *see Kinkead v. Humana at Home, Inc.*, 450 F. Supp. 3d 162, 187, 189 (D. Conn. 2020) (holding, in a private action to enforce the overtime rule, that defendants' reliance on DOL's non-enforcement policy as a defense to liability and liquidated damages was "not reasonable").

Moreover, there is record evidence that private enforcement actions could still go forward, and that the County knew that. Minutes from an October 1, 2015, meeting of the County's FLSA Steering Committee noted that the overtime rule would be "effective 10/13/15" and that the "only way to 'postpone' implementation is if agencies file a motion with the United States Supreme

Court."[2]  On November 30, 2015, the California Welfare Directors Association sent the County a Q&A document noting that DOL's non-enforcement policy "doesn't insulate employers from potential lawsuits."  Earlier that month, the California Association of Counties had circulated similar guidance.  As these communications attest, DOL's decision to delay federal enforcement of the overtime rule until November 12, 2015 is not informative as to whether the County had an objectively reasonable belief that no overtime wages were due to IHSS providers for the period between October 13, 2015, and February 1, 2016.

The County's third argument—that it lacked authority to pay IHSS providers—is more substantial.  We recognized in *Ray I* that the County had "no discretion over the action (or inaction) that subjected it to potential liability here: payment of overtime wages under the FLSA."  935 F.3d at 711.  But although it may seem anomalous to hold the County liable for unpaid overtime wages when it ordinarily did not directly remit payment, the FLSA compels that result.

The County has not pointed to any cases excusing a joint employer from compliance with the FLSA on the ground that only the other employer had the usual authority directly to take the actions that would constitute compliance.  Such a result would be inconsistent with the well-established rule that "joint employers

_____

[2] The Supreme Court denied an application for a stay of the mandate on October 6, 2015. The Supreme Court denied a petition for writ of certiorari on June 27, 2016. *Home Care Ass'n of Am. v. Weil*, 579 U.S. 927 (2016).

9

are individually responsible for compliance with the FLSA." *Bonnette*, 704 F.2d at 1469. That rule reflects the "broad remedial purposes of the [FLSA]," *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997) (citation omitted), a statute we "construe[] liberally in favor of employees," *Rosenfield v. GlobalTranz Enters., Inc.*, 811 F.3d 282, 285 (9th Cir. 2015) (citation omitted). Allowing joint employers to avoid liability for violations of the FLSA by showing they ordinarily did not perform a particular employer function would risk undermining the statute's remedial purposes. Holding joint employers "individually and jointly" responsible for compliance, regardless of whether, for example, one joint employer "is controlled by" the other employer and may not perform some functions, is consistent with DOL's longstanding guidance on joint employment. 29 C.F.R. § 791.2(a), (b)(3) (2019).

I would reverse the district court's denial of partial summary judgment to Ray on the issue of liquidated damages.

## II.

I would also reverse the district court on the issue of willfulness. The FLSA has a two-year statute of limitations for actions for unpaid overtime compensation unless the violation was "willful," in which case the statute of limitations is three years. 29 U.S.C. § 255(a).

Ray filed suit on June 7, 2017, seeking relief for unpaid overtime wages between January 1, 2015, and February 1, 2016. For IHSS providers who opted into the collective action after the complaint was filed, the timeliness of their claims is measured from the date they filed a written consent to opt into the action. *See* 29 U.S.C. § 256(b). The district court equitably tolled the statute of limitations from September 28, 2017, the date the district court denied the County's motion to dismiss, to December 11, 2019, the date the court conditionally certified the collective.[3] Ray maintains that the County's alleged violation of the FLSA was willful beginning on October 13, 2015, when *Weil II* mandated. Although some providers opted into the collective action within two years of that date (not counting the time during which the statute of limitations was equitably tolled), others did not.

To show a willful violation, Ray must prove that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). I would hold that Ray introduced evidence sufficient to raise a triable issue as to whether the County "either knew or showed reckless disregard for the matter of whether its conduct" violated the FLSA between October 13, 2015, and February 1, 2016. *See id.*

---

[3] That ruling has not been appealed.

11

As I have explained, there was evidence that the County knew (1) that the overtime rule would take effect when *Weill II* mandated on October 13, 2015, and (2) that there was a likelihood the courts would hold it was liable as a joint employer of IHSS providers, particularly given *Bonnette*, DOL's position, and the fact that other counties had been deemed liable. *See Bonnette*, 704 F.2d at 1470; *Guerrero*, 213 Cal. App. 4th at 930–37. And Ray introduced evidence that the County knew that employers could face liability in private lawsuits for failing to pay overtime wages after October 13, 2015, even if DOL was not yet enforcing the new rule. *See supra* pp. 8–9.

The County maintains that it had no ability to implement overtime pay because the State controls payroll for IHSS providers. But, again, the County does not cite any authority excusing it from complying with the FLSA because it is a joint employer with only partial responsibility for implementing the program. Ray's evidence was sufficient to create a triable issue as to whether the County knew or showed reckless disregard for whether the failure to pay overtime wages beginning on October 13, 2015, violated the FLSA. I would therefore hold that the district court erred in granting partial summary judgment to the County on the issue of the length of the limitations period.

**III.**

12

For the foregoing reasons, I would hold that the County is, on the record here, liable for liquidated damages for the period between October 13, 2015 and February 1, 2016. Further, for purposes of determining whether its conduct was willful and so triggered a three-year limitations period, I would hold that Ray raised a triable issue of fact as to whether the County knew or showed reckless disregard that its conduct violated the FLSA during that period. I therefore respectfully dissent as to those two issues.